In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00034-CR
______________________________


KELLY EDWARD CARTER, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 30125-B


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

Â Â Â Â Â Â Â Â Â Â Kelly Edward Carter pled guilty before a jury to the offense of indecency with a child
by contact. The trial court instructed the jury to find Carter guilty. The jury found Carter
guilty, as instructed, and then assessed his punishment at twenty years' imprisonment and
a fine of $10,000.00. The trial court sentenced Carter in accordance with the jury's verdict. 
Â Â Â Â Â Â Â Â Â Â Carter appeals, alleging five points of error: 1) the trial court erred in not
suppressing a written statement given by Carter to police; 2) the trial court erred in finding
that Carter entered his plea of guilty voluntarily; 3) Carter's trial counsel was ineffective for
failing to introduce to the jury evidence of Carter's alleged mental deficiency; 4) Carter's
sentence of twenty years' imprisonment and fine of $10,000.00 is cruel and unusual
punishment, in violation of the Eighth Amendment to the United States Constitution; and
5) the Texas Rules of Appellate Procedure governing the procedure for pursuing a motion
for new trial, perfecting an appeal, and acquiring the record of trial proceedings are
unconstitutional. We overrule these contentions and affirm the judgment.
Motion To Suppress
Â Â Â Â Â Â Â Â Â Â Carter contends the trial court erred in overruling his motion to suppress his written
statement because it was not made knowingly and voluntarily. However, a guilty plea to
a felony offense entered before a jury admits all elements of the offense charged and is
conclusive as to the defendant's guilt. Brinson v. State, 570 S.W.2d 937, 938â39 (Tex.
Crim. App. [Panel Op.] 1978). Thus, the judgment of guilt in this case was based on
Carter's plea of guilty before the jury and was rendered independent of, and is not
supported by, any alleged error in the trial court's ruling on Carter's motion to suppress. 
See Simpson v. State, 67 S.W.3d 327, 329â30 (Tex. App.âTexarkana 2001, no pet.). Â Â Â Â Â Â Â Â Â Â Because Carter's guilty plea to the jury waived any error in the trial court's ruling on
Carter's motion to suppress, we overrule his first point of error. 
Voluntariness of Plea
Â Â Â Â Â Â Â Â Â Â Carter contends that he did not knowingly and voluntarily enter his plea of guilty and
that, therefore, the trial court erred in accepting the plea. We review the voluntariness of
a plea of guilty by examining the record as a whole and considering the plea in the totality
of the circumstances. Griffin v. State, 703 S.W.2d 193, 196 (Tex. Crim. App. 1986). 
Â Â Â Â Â Â Â Â Â Â Carter predicates his argument on his assertion he was mentally incompetent to
enter a plea before the trial court. A person is presumed to be competent to stand trial
unless proven incompetent. Tex. Code Crim. Proc. Ann. art. 46B.003 (Vernon Supp.
2004â2005). A person is incompetent to stand trial if that person lacks "sufficient present
ability to consult with [that] person's lawyer with a reasonable degree of rational
understanding; or . . . a rational as well as factual understanding of the proceedings against
[that] person." Id.
Â Â Â Â Â Â Â Â Â Â The trial court appointed a medical doctor to examine Carter and report on his
competency to stand trial. The letter report filed by Dr. John Hall


 states that Hall found
Carter to "have sufficient present ability to consult with his lawyers with a reasonable
degree of rational understanding and [to] have a rational as well as factual understanding
of the proceedings against him. He is not mentally ill." The report further states, "it was
my opinion that [Carter] could assist his counsel in his defense and had a realistic
understanding of the charges against him." The trial court cited the doctor's report as part
of the court's consideration in finding Carter's plea to have been made freely and
voluntarily. 
Â Â Â Â Â Â Â Â Â Â Further, looking at the complete record of Carter's plea hearing, we find there was
sufficient evidence of Carter's competency to stand trial. Although Carter directs us to
several instances in the record where his responses to the trial court's questions were
confusing, we find, after viewing these exchanges in context, that Carter entered his plea
voluntarily. 
Â Â Â Â Â Â Â Â Â Â In response to the court's questions, Carter told the court his age, that he had
attained "a diploma" from school, and that he had no history of insanity or of being under
psychiatric care. Trial counsel advised the court he had known Carter about four months
and had no indication Carter had any mental defects. He further stated, "I would point out
to the Court that we had a Dr. Brown examine [Carter] for competency and found him to
be competent to stand trial." Carter did not equivocate when the trial court asked how he
pled to the charge of indecency with a child; he answered, "Guilty, sir." He was equally
clear and direct in responses to the trial court's questions and admonishments concerning
the range of punishment and the fact he would have to register as a sex offender for the
rest of his life. Carter acknowledged signing the stipulation of evidence, pointing out to the
trial court where his signature could be found on the page. 
Â Â Â Â Â Â Â Â Â Â Carter calls to our attention, however, that, in response to the trial court's question
concerning whether he had an opportunity to ask his attorney questions regarding the
stipulation's consequences, his response was, "To a point, yes, I did." He contends this
response points to a lack of competency or cognition of his situation. Nonetheless, when
the trial court asked if there was anything Carter wanted to ask his lawyer that he had not
been able to ask previously, Carter replied, "No." 
Â Â Â Â Â Â Â Â Â Â Carter also points to his answers to the trial court's questions in the following
colloquy as illustrating his "bizarre" answers and showing that he was "mentally off in some
other reality": 
THE COURT: Anybody promised you any hope of a reward, the
delusion of a pardon or any form of leniency causing you to come in here
and plead guilty?
Â 
[Carter]: Well, at first -- when I first came to court to begin with, yes,
I was granted a pardon to begin with, but -- 
Â 
THE COURT: What?
Â 
[Carter]: That was when my mom came down here the first time to
the court, but I don't know.

Â Â Â Â Â Â Â Â Â Â However confusing these responses were, Carter's responses to the court's
follow-upâand more directâquestions were appropriate:
THE COURT: The question is, has anybody promised you anything
to get you to plead guilty to Count II of this indictment?
Â 
[Carter]: No.
Â 
THE COURT: Has anyone threatened you?
Â 
[Carter]: No. 
Â 
THE COURT: Put any pressure on you?
Â 
[Carter]: No.
Â 
THE COURT: Is your lawyer making you do something you don't want
to do?
Â 
[Carter]: No.

Â Â Â Â Â Â Â Â Â Â When viewed in the totality of the court's admonitions, we find no evidence that
Carter lacked either sufficient present ability to consult with his attorney, or a rational and
factual understanding of the proceedings. We find the trial court did not err in finding that
Carter entered his plea voluntarily and in accepting such plea. Carter's second point of
error is overruled.
Ineffective Assistance of Counsel
Â Â Â Â Â Â Â Â Â Â Carter contends his trial counsel was constitutionally ineffective for failing to raise
potentially mitigating evidence to the jury showing Carter's alleged mental deficiencies. 
Â Â Â Â Â Â Â Â Â Â The standard of testing claims of ineffective assistance of counsel is set out in
Strickland v. Washington, 466 U.S. 668 (1984), and adopted for Texas constitutional
claims in Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). To prevail on
this claim, an appellant must prove by a preponderance of the evidence (1) that counsel's
representation fell below an objective standard of reasonableness and (2)Â that the deficient
performance prejudiced the appellant's defense. Strickland, 466 U.S. at 687; Rosales v.
State, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999). To meet this burden, the appellant must
prove that his or her attorney's representation fell below the standard of prevailing
professional norms and that there is a reasonable probability that, but for such attorney's
deficiency, the result of the trial would have been different. Tong v. State, 25 S.W.3d 707,
712 (Tex. Crim. App. 2000). Under this standard, a claimant must prove that counsel's
representation so undermined the proper functioning of the adversarial process that the
trial cannot be relied on as having produced a just result. Strickland, 466 U.S. at 686. 
Â Â Â Â Â Â Â Â Â Â Our review of counsel's representation is highly deferential; we indulge a strong
presumption that counsel's conduct falls within a wide range of reasonable representation. 
Strickland, 466 U.S. at 689; Tong, 25 S.W.3d at 712. This Court will not second-guess
through hindsight the strategy of counsel at trial, nor will the fact that another attorney
might have pursued a different course support a finding of ineffectiveness. Blott v. State,
588 S.W.2d 588, 592 (Tex. Crim. App. 1979). That another attorney, including appellant's
counsel on appeal, might have pursued a different course of action does not necessarily
indicate ineffective assistance. Harner v. State, 997 S.W.2d 695, 704 (Tex.
App.âTexarkana 1999, no pet.). Any allegation of ineffectiveness must be firmly founded
in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. 
Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). 
Â Â Â Â Â Â Â Â Â Â The two-pronged test of Strickland applies to guilty pleas. Hill v. Lockhart, 474 U.S.
52, 58 (1985); Ex parte Pool, 738 S.W.2d 285, 286 (Tex. Crim. App. 1987). The
voluntariness of the plea depends (1) on whether counsel's advice was within the range
of competence demanded of attorneys in criminal cases, and if not, (2) whether there is
a reasonable probability that, but for counsel's errors, appellant would not have entered his
or her plea and would have insisted on going to trial. Hill, 474 U.S. at 59; Ex parte Morrow,
952 S.W.2d 530, 536 (Tex. Crim. App. 1997).
Â Â Â Â Â Â Â Â Â Â Although Carter filed a motion for new trial, he did not pursue it to hearing, and the
motion was overruled by operation of law. Accordingly, there is no evidence regarding plea
negotiations or trial counsel's strategy. When ineffective assistance is raised on direct
appeal, appellate counsel and the court must proceed on a trial record not developed for
the object of litigating or preserving the claim and thus often incomplete or inadequate for
this purpose. Freeman v. State, 125 S.W.3d 505, 506 (Tex. Crim. App. 2003). It is true
some claims may be disposed on direct appeal where "trial counsel's ineffectiveness is so
apparent from the record." Massaro v. United States, 538 U.S. 500, 508 (2003); Freeman,
125 S.W.3d at 507. 
Â Â Â Â Â Â Â Â Â Â This Court has held that counsel need not undertake the same magnitude of
independent factual investigation when the defendant knowingly and voluntarily pleads
guilty to the alleged offense as would be required in a contested proceeding. Toupal v.
State, 926 S.W.2d 606, 608 (Tex. App.âTexarkana 1996, no pet.). As noted above, trial
counsel had worked with Carter on this case for at least four months. The indictment
against Carter initially charged him with one count of aggravated sexual assault of a child
and three counts of indecency with a child by contact. The charges against him therefore
went from a four count indictment, where one of those counts was a first degree felony, to
a single count of a second degree felony. Carter was sentenced to the maximum penalty
for a second degree felony, but he faced the possibility of life in prison had he been tried
and convicted for all the charges in the original indictment. In light of the report from the
court-appointed physician who evaluated Carter and found him competent to stand trial,
and the absence of any evidence in the record establishing that Carter actually has a
mental deficiency, we cannot say trial counsel was ineffective. This point of error is
overruled.
Eighth Amendment Violation
Â Â Â Â Â Â Â Â Â Â Carter complains his sentence of twenty years' imprisonment and fine of $10,000.00
violates the prohibition of cruel and unusual punishment in the United States Constitution's
Eighth Amendment. Carter did not present this issue to the trial court; therefore, he did not
preserve it for our review. See Tex. R. App. P. 33.1(a); Jackson v. State, 989 S.W.2d 842,
844 (Tex. App.âTexarkana 1999, no pet.).



Constitutionality of Rules
Â Â Â Â Â Â Â Â Â Â Finally, Carter complains that the Rules of Appellate Procedure and the time limits
created thereby violate his rights under the United States and Texas Constitutions. Carter
argues that, under the deadlines created by Tex. R. App. P. 35.2, it is possible that an
appellate counsel will not have the reporter's record of the trial in time to review that
recordâand evaluate the effectiveness of trial counselâbefore the deadline to argue a
motion for new trial. 
Â Â Â Â Â Â Â Â Â Â Carter claims that, under the Texas Court of Criminal Appeals' holding in ExÂ parte
Townsend,


 he is forced to bring his claim of ineffectiveness on direct appeal despite not
having insight into trial counsel's strategies and thinking. According to Carter's reading of
Townsend, any claim not brought on direct appeal is precluded from presentation on
habeas corpus review. This is not totally correct. Townsend does not stand for the
proposition that a claim of ineffective assistance of counsel must always be raised on direct
appeal to preserve that claim for potential review on an application for habeas corpus. In
Townsend, the petitioner raised, for the first time on his application for habeas relief, that
the trial court erred in cumulating or "stacking" his sentence following a revocation of
community supervision with his subsequent sentence for murder. Townsend, 137 S.W.3d
at 80. The Texas Court of Criminal Appeals held Townsend could have raised this issue
on direct appeal, and by first raising it on habeas review, had waived the claim. Id. at
81â82. 
Â Â Â Â Â Â Â Â Â Â There is a long line of cases reviewing counsel's effectiveness on habeas
application where the same has not been made on direct appeal; in fact, the Texas Court
of Criminal Appeals has consistently stated such is the preferred chronology for reviewing
such claims.


 After Townsend, the Texas Court of Criminal Appeals addressed a claim of
ineffective assistance on habeas review even though that claim had not been raised on
direct appeal. Ex parte White, Nos. 74,757 & 74,758, 2004 Tex. Crim. App. LEXIS 1612
(Tex. Crim. App. Sept. 29, 2004). Additionally, this Court has not hesitated to find
constitutionally ineffective assistance of counsel on direct appeal where the record before
us supports such a holding. See Hall v. State, No. 06-03-00253-CR, 2005 Tex. App.
LEXIS 508 (Tex. App.âTexarkana Jan. 25, 2005, no pet. h.). 
Â Â Â Â Â Â Â Â Â Â In this case, Townsend may require that Carter's claim of ineffective assistance be
raised first on direct appeal. But in light of the Texas Court of Criminal Appeals' willingness
to consider such claims for the first time on collateral review even where not raised on
direct appeal, we do not find the Texas Rules of Appellate Procedure to have the
debilitating effect argued by Carter.


 This point of error is overruled.
Conclusion
Â Â Â Â Â Â Â Â Â Â We affirm the judgment.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Donald R. Ross
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice
Â 
Date Submitted:Â Â Â Â Â Â October 13, 2005
Date Decided:Â Â Â Â Â Â Â Â Â April 12, 2005

Do Not Publish



nter-ideograph;
mso-pagination:widow-orphan;tab-stops:center 3.25in'>   MICHAEL LYNN PHELPS,
Appellant

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  V.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE STATE OF TEXAS, Appellee

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  On Appeal from the 6th Judicial District Court

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Red
River County, Texas

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Trial Court
No. CR01675

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Before Morriss, C.J.,
Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Memorandum Opinion by Justice Moseley








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MEMORANDUMÂ 
OPINION

Â 

Â Â Â Â Â Â Â Â Â Â Â  After
an incident in which Michael Lynn Phelps struck his wife, Roxanna, repeatedly
with a 2Â x 2Â board with a nail protruding from it, threw scalding water on
her, hit her with a broom handle, kicked her with his boot-clad feet, punched
her with his fists, strangled her, slammed her head against a wall, sexually
assaulted her with a shampoo bottle, and smeared dog feces on her, Phelps was
convicted by a jury of aggravated assault with a deadly weapon.Â  After pleading true to the StateÂs
enhancement paragraph, Phelps was sentenced to sixty yearsÂ imprisonment.Â  Phelps has appealed his conviction with his
sole point of error on appeal being that he says that he believes the evidence
is insufficient to support the juryÂs finding that he used or exhibited a
deadly weapon during the commission of the assault.Â  Because we find the evidence sufficient to
support this finding by the jury, we overrule PhelpsÂ sole point of error and
affirm the trial courtÂs judgment. 

I.Â Â Â Â Â Â Â Â Â  Standard of Review

Â Â Â Â Â Â Â Â Â Â Â  In
evaluating legal sufficiency, we review all the evidence in the light most
favorable to the juryÂs verdict to determine whether any rational jury could
have found the essential elements of aggravated assault with a deadly weapon
beyond a reasonable doubt. Â Brooks v. State, 323 S.W.3d 893, 912
(Tex. Crim. App. 2010) (citing Jackson v.
Virginia, 443 U.S. 307, 319 (1979)); Hartsfield
v. State, 305 S.W.3d 859, 863 (Tex. App.ÂTexarkana 2010, pet. refÂd)
(citing Clayton v. State, 235 S.W.3d
772, 778 (Tex. Crim. App. 2007)).Â  Our
rigorous legal sufficiency review focuses on the quality of the evidence
presented.Â  Brooks, 323 S.W.3d at 917 (Cochran, J., concurring).Â  We examine legal sufficiency under the
direction of the Brooks opinion,
while giving deference to the responsibility of the jury Âto fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.Â Â Hooper
v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson, 443 U.S. at 318Â19).Â  

Â Â Â Â Â Â Â Â Â Â Â  Legal
sufficiency of the evidence is measured by the elements of the offense as
defined by a hypothetically-correct jury charge. Â Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); see also Grotti v. State, 273 S.W.3d 273, 280 (Tex. Crim. App.
2008); Vega v. State, 267 S.W.3d 912,
916 (Tex. Crim. App. 2008). Â Under the
hypothetically-correct jury charge, the State was obligated to prove (1) that
Phelps intentionally or knowingly caused bodily injury to Roxanna and (2) that
he used or exhibited a deadly weapon during the commission of the assault. Â Tex.
Penal Code Ann. Â§Â§ 22.01, 22.02(a)(2) (West 2011).Â  Here, the StateÂs indictment alleged Phelps
Âdid then and there use or exhibit a deadly weapon, to-wit: Â a piece of wood with a nail protruding from
it.ÂÂ  Phelps does not challenge the
allegation that he intentionally or knowingly caused bodily injury to
Roxanna.Â  Rather, Phelps complains, ÂAlthough
there is evidence that the piece of wood was capable of causing, and did cause,
bodily injury in its manner of use, there is insufficient evidence that it was
capable of causing serious bodily injury.ÂÂ 


Â Â Â Â Â Â Â Â Â Â Â  Under
the Texas Penal Code, a deadly weapon is Âanything that in the manner of its
use or intended use is capable of causing death or serious bodily injuryÂ; it
need not actually cause death or serious bodily injury.[1] Â Tex.
Penal Code Ann. Â§ 1.07(a)(17)(B) (West 2011); Charleston v. State, 33 S.W.3d 96, 100 (Tex. App.ÂTexarkana 2000,
pet. refÂd).Â  Serious bodily injury
includes bodily injury that creates a Âprotracted loss or impairment of the
function of any bodily member or organ.ÂÂ 
Tex. Penal Code Ann. Â§
1.07(a)(46) (West 2011).Â  

Â Â Â Â Â Â Â Â Â Â Â  Because
the wooden board in this case was not designed, made, or adapted for the purpose
of inflicting bodily injury, it is not a deadly weapon per se.Â  See
McCain, 22 S.W.3d at 502; In re S.B.,
117 S.W.3d 443, 446 (Tex. App.ÂFort Worth 2003, no pet.); Charleston, 33 S.W.3d at 99. Â The following five-factor test can be used in
determining whether the wooden board could have been determined to be
classified as a deadly weapon: Â (1)Â physical
proximity between the victim and the object; (2) the threats or words used by
the assailant; (3) the size and shape of the weapon; (4) the weaponÂs ability
to inflict death or serious injury; and (5) the manner in which the defendant
used the weapon. Â Nash v. State, 175 S.W.3d 427, 430 (Tex. App.ÂTexarkana 2005, pet.
refÂd) (citing Brown v. State, 716
S.W.2d 939, 946Â47 (Tex. Crim. App. 1986); Tisdale
v. State, 686 S.W.2d 110, 115 (Tex. Crim. App. 1984); English v. State, 647 S.W.2d 667, 669 (Tex. Crim. App. 1983); Blain v. State, 647 S.W.2d 293, 294
(Tex. Crim. App. 1983); Williams v. State,
575 S.W.2d 30 (Tex. Crim. App. [Panel Op.] 1979)).Â  No one factor is determinative, and each case
must be examined on its own facts. Â Either
expert testimony or lay testimony may be sufficient to support a finding.Â  English,
647 S.W.2d at 668Â69.

II.Â Â Â Â Â Â Â  RoxannaÂs Testimony
Established that the Wooden Board Was a Deadly Weapon

Â Â Â Â Â Â Â Â Â Â Â  At
trial, Roxanna recounted a history of domestic violence.Â  She testified that Phelps believed she might
have been having an affair, at one point telling her that he had seen someone
Ârunning out the back doorÂ of their residence, and at another point becoming
jealous when he came across MySpace and Facebook pages that appeared to be
RoxannaÂs.Â  Roxanna insisted that she had
not created new profiles on MySpace and Facebook and that the profile Phelps
was viewing was not hers.Â  She claimed
that PhelpsÂ jealousy was provoked on the day of the incident by the barking of
their dogs.Â  She testified:

He says, go look and see whoÂs out there, or
whatÂs out there.Â  And I told him, if I
look and tell you thereÂs nothing out there, youÂre not going to believe me
anyway.Â  . . . I said, you go look out
the window.Â  The next thing I know, heÂs
done swung a punch and hit me in the face. Â . . . He was yelling at me and then he looked
and he seen the blood and he said, oh, my God, you know, what did I do.Â  He went and got ice.Â  He said, see, if you wouldnÂt talk to me that
way, I wouldnÂt have to get angry with you like this. 

Â 

Â Â Â Â Â Â Â Â Â Â Â  Phelps
next advised Roxanna to admit that the profiles he saw on Facebook and MySpace
were created by her.Â  In an effort to put
an end to PhelpsÂ violent behavior, Roxanna told Phelps that the profiles were
hers. Â Contrary to her belief, the
requested admission did not cause a cessation of the violent conduct.Â  She testified,

He calmed down for a little bit and then he got angry
again.Â  He said, you lied to me, you lied
to me, and then it just got worse and worse and it escalated again.Â  He started hitting me again. Â . . . He hit me in the face several
times.Â  Drug me into the living
room.Â  I was on the couch.Â  He said do not move.Â  He came back with a board. 

Â 

Â Â Â Â Â Â Â Â Â Â Â  A
nail protruded from the board, described as a Â2x2,Â which appeared to be a
board that had been separated from a railing used on the deck of the
residence.Â  Phelps used the board to hit
RoxannaÂs face, the nail in the board leaving a deep scar on her cheek.Â  One of the blows with the board by Phelps on
RoxannaÂs knee was of sufficient force and violence as to cause the board to
break in two, not an inconsiderable blow.Â 
Roxanna testified, ÂHe said he was going to bust my kneecap.ÂÂ  

Â Â Â Â Â Â Â Â Â Â Â  Phelps
continued his abuse of Roxanna by throwing scalding water at her face, which
caused the skin contacted by the water to Âbubble[] out at the time.ÂÂ  He also beat her on her legs with a broom
handle, kicked her while wearing boots, punched her with his fists, strangled
her, rubbed her with dog feces, slammed her head against a wall, and sexually
assaulted her with a shampoo bottle.Â 
After the incident, Roxanna was left severely battered and bruised, as
demonstrated in the pictures taken by the police after the incident had come to
an end.[2]Â  She was transported by ambulance to Paris
Regional Medical Center, where medical personnel noted that she had sustained
Âmultiple lacerations, bruising, [and] burns from head to toe.ÂÂ  Roxanna testified that the wooden board could
have caused her death or serious injury and that she still bore scars on her
knee from the incident.Â  

Â Â Â Â Â Â Â Â Â Â Â  Reviewing
all the evidence in the light most favorable to the juryÂs verdict, we find it
sufficient for a rational jury to have concluded that the piece of wood, as
used and as threatened to be used, was a deadly weapon.Â  First, Roxanna testified (and Phelps
concedes) Âthat the piece of wood with a protruding nail was theoretically capable
of causing serious bodily injury.ÂÂ 
According to Phelps, Âthe more difficult issue is whether the manner of
the use of the piece of wood in this particular situation establishes that it
was used as a deadly weapon.ÂÂ  Phelps
used the board to hit Roxanna in the face and on her knee.Â  In addition to the actual employment of the
piece of wood to strike her, he threatened her with serious injury or
protracted loss or impairment to her knee by stating he was Âgoing to bust
[her] kneecap.ÂÂ  Because Phelps used the
board, which he concedes was capable of causing bodily injury, to hit Roxanna
in the knee with such force that the board broke in two, the jury could find
that the manner of his use of the board could inflict serious injury.Â  Therefore, we find the evidence legally
sufficient for a jury to have found that Phelps used a deadly weapon during the
commission of his assault against Roxanna.Â 
See Bailey v. State, 46 S.W.3d
487 (Tex. App.ÂCorpus Christi 2001, pet. refÂd) (finding boards capable of
causing serious bodily injury). 

Â Â Â Â Â Â Â Â Â Â Â  We
overrule PhelpsÂ sole point of error.Â  

III.Â Â Â Â Â Â  Conclusion


Â Â Â Â Â Â Â Â Â Â Â  We
affirm the judgment of the trial court. 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Bailey
C. Moseley

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  July 19, 2011

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  July 21, 2011

Â 

Do Not PublishÂ Â Â Â Â Â Â Â Â Â  

Â 











[1]In
McCain v. State, 22 S.W.3d 497, 503
(Tex. Crim. App. 2000), the court stated regarding Section 1.07(a)(17)(B)
that:Â  

Â 

The
provisionÂs plain language does not require that the actor actually intend
death or serious bodily injury; an object is a deadly weapon if the actor
intends a use of the object in which it would be capable of causing death or
serious bodily injury.Â  The placement of
the word ÂcapableÂ in the provision enables the statute to cover conduct that
threatens deadly force, even if the actor has no intention of actually using
deadly force.





[2]Roxanna
also suffered a broken nose, which required plastic surgery to remedy.Â  However, it is unclear from the record whether
her nose was broken when Phelps hit her in the face with the board, or whether
this injury occurred before or after the board was used.Â